[S. F. No. 13870. In Bank.—May 29, 1931.]

S. H. CHASE LUMBER COMPANY (a Corporation) et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

The facts are stated in the opinion of the court.

Rea & Caldwell, Nat Schmulowitz, George B. Harris and Gavin McNab, Schmulowitz, Wyman, Aikins & Brune for Petitioners.

Arthur T. George, Ira H. Rowell and Roderick B. Cassidy for Respondent.

Archer Bowden, E. J. Foulds, R. S. Myers, C. C. Carleton, Harry A. Encel, Ivan Kelso, John Berryman, Erwin P. Werner, City Attorney (Los Angeles), J. J. O'Toole, City Attorney (San Francisco), E. J. Sinclair, City Attorney (Berkeley), Thomas M. Carlson, City Attorney (Richmond), J. Leroy Johnson, City Attorney (Stockton), J. F. Goux, City Attorney (Santa Barbara), Hugh B. Bradford, City Attorney (Sacramento), Joseph L. Knowles, Assistant City Attorney, and Claud L. Rowe, City Attorney (Fresno), *Amici Curiae.*

RICHARDS, J.—This proceeding in the nature of an application for a writ of prohibition, was instituted in this court by the petitioners, who allege themselves to be the owners of certain real property, respectively, in the city of San Jose, at the intersection of Julian and Center Streets in said city, their respective properties extending for a considerable distance along and upon the south line of Julian Street eastward and westward of said intersection with Center Street, and also extending for a considerable distance south of said intersection along and abutting Center Street, together with the ownership of the fee in Center Street, respectively, to the center of said street. Petitioners seek the issuance of a writ of prohibition by this court preventing the respondent Railroad Commission from further proceeding with the enforcement and execution of a certain special order to be hereinafter more specifically referred to, providing for the construction and use by the Southern Pacific Company of an elevated grade crossing at the intersection of said streets, and also providing for the fixation by the Commission of the damages to be awarded by it

to the respective properties of these petitioners resulting from the making and enforcement of said order, which the petitioners assert to be in violation of the provisions of section 14 of article I of the state Constitution, which forbids the taking and damage of private property for a public use without just compensation having been first ascertained by the verdict of a jury in proceedings in eminent domain before a court of competent jurisdiction. The respondent appeared by both demurrer and answer to said petition and by its latter pleading undertook to justify the making and enforcement of its said order under the provisions of sections 22 and 23 of article XII of the Constitution, and under the enactment by the state legislature of the Public Utilities Act (Stats. 1915, p. 115, as amended in 1917; Stats. 1917, p. 320), and in 1927 (Stats. 1927, p. 1267), adopted in pursuance of the foregoing constitutional provision, and particularly of sections 43(a) and 43(b) of said act.

The proceeding out of which this controversy arises had its immediate inception in a certain application presented on or about January 16, 1930, by the city of San Jose, a municipal corporation, which after setting forth certain facts, to be hereafter referred to as the basis thereof, prayed said Commission to make and enter an order fixing the just compensation to be paid for the damage to each piece or parcel of property specified in said petition, among which were the respective properties of the petitioners herein, and that the commissioners make such final order of condemnation as may be proper in the premises. The foregoing petition of said city was but one of a series of proceedings theretofore had and taken and whereby and whereunder the Railroad Commission had assumed jurisdiction over the general subject of the transposition of the route and tracks of the Southern Pacific Company from their former position along and upon Fourth Street in said city from a point at or near Washington Street therein to the southern city limits thereof, and the relocation of such railroad route and tracks along and across the entire length of said city north and south and upon or near the westerly boundaries thereof.

In the year 1867 the city of San Jose had awarded a fifty-year franchise to the predecessor of the present Southern Pacific Company, entitling it to construct and operate a

single-track railroad line upon and along the aforesaid portion of Fourth Street, which street lies within or immediately adjacent to the central or business portion of said city. Said railroad was constructed and operated thereafter under the terms of said franchise until in the year 1917, when, by the terms thereof it was about to expire, a public agitation arose in said city having for its animating purpose the removal of said railroad line from its location on Fourth Street to another location across the entire longitudinal length of the city and at or near the westerly boundaries thereof. As a result of this agitation the said railroad company, which in the meantime had become a part of a transcontinental railway system, made application to the Interstate Commerce Commission for permission to make such transposition, which application was granted by said Commission on October 11, 1928. (145 I. C. C. 515.) On December 5, 1928, the city of San Jose, pursuant to an application therefor made by said company, granted a franchise to it ''to construct a line of railroad through the city of San Jose over, along and across the several streets, lanes, alleys and highways hereinafter described'', etc. The description of the route of the railroad to be constructed in conformity with said franchise along the route specified therein provides expressly for the closing of Center Street throughout its entire length of several blocks, and further provides for the construction of overhead tracks at eight designated street crossings in said city, one of which is at the intersection of Julian and Center Streets, and for the construction and maintenance of such an elevated railroad line and tracks between such crossings as would require the cessation and abandonment of the use of the streets to be occupied by said railroad company between such prescribed elevated crossings. The description and character of the railway to be constructed in conformity with said franchise provides expressly for the closing of Center Street throughout its entire length of several blocks, since the entire width of said street was to be occupied by the several tracks of said railroad at its prescribed elevation. The said franchise also contained the following express provision: ''It is understood that the grantee shall at the time of applying for authority to construct the crossings as above specified, in order to avoid unnecessary grade crossings, ask the Railroad Commission for an order directing the city of

San Jose to close and abandon the following streets within the following limits, that is to say, San Fernando, Kearney street, Center street between Lenzen avenue and San Augustine street, Pine street, Cahill street, San Carlos street, Jerome street, Martin avenue, Fuller avenue, Bartlett avenue, Goodyear street and Sunnyside avenue. The closing of said streets shall be a condition precedent to the carrying out of this franchise.'' Immediately following the granting of such franchise to the said railroad company it presented its application to the Railroad Commission for authority to construct the various crossings over pubilc thoroughfares involved in the aforesaid relocation and of its main line tracks through the city of San Jose and for a distance beyond the southerly limits thereof the entire length of its relocated line, approximately five miles. The petition thus presented sets forth that as a result of said construction, which contemplated the elevation of the tracks of said railroad along the course thereof through said city, certain public streets are to be closed, and among these that Center Street is to be closed between Cinnabar and San Augustine Streets, the elevated crossing of such railroad at Julian Street lying between these two streets. In response to said application public hearings were thereon had in said city, with the result that the Railroad Commission made and entered its order granting said application and authorizing the Southern Pacific Company to construct its main line railroad upon and along the designated length and location thereof in said city, and to construct the elevated roadbed of said railroad along such streets and avenues of said city as would be occupied by it between those certain street intersections where separated grade crossings were to be provided. By the terms of its aforesaid order the elevation of said railroad at and between said several points of street intersections at elevated grades was provided for and by said order it was further provided that the same was made and was to be carried into effect upon ''the express condition that the following streets and alleys in the city of San Jose be legally abandoned and effectively closed at the respective points of crossing with the existing or proposed tracks of applicant: Center street, San Augustine street.'' Thereafter and on the sixteenth day of January, 1930, the city of San Jose presented its petition to the Railroad Commission above referred to, and which forms the immediate background

of the present proceeding and wherein the said city, with express reference to the foregoing decision and order of the Railroad Commission dated December 5, 1928, and to that portion thereof which purported to grant to the railroad company authority to construct a separated grade crossing at the intersection of Julian and Center Streets, petitioned the Railroad Commission to fix the just compensation to be paid for the property of certain property owners at and along the lines of said streets in the course of the construction of the aforesaid elevated grade crossing at Julian Street. Among the several owners of property alleged in said petition to be thereby injuriously affected as to their respective properties were the Chase Lumber Company and Alice K. Farney, the petitioners herein. As to the Chase Lumber Company it was averred therein to be the owner of a certain specifically described tract of land lying at the southeast corner of said intersection and extending a distance of 253.58 feet eastwardly along Julian Street and a distance along the easterly line of Center Street 359.5 feet. As to the petitioner herein, Alice K. Farney, her property was described as being upon the southwesterly corner of said intersection and extending along the southerly line of Julian Street a distance of 110 feet and along the westerly line of Center Street a distance of 126 feet from the point of said intersection. The petitioning city prayed that the Railroad Commission make and enter its order of condemnation and fixation of damages in the form and effect hereinabove set forth. The Commission thereupon made the order which the petitioners herein assail in this proceeding. In response to said petition the Railroad Commission made and issued an order to show cause why the same should not be granted and directing the service thereof upon the several property owners named in said petition, and among them these petitioners, who did not appear in response to said order to show cause, but on the contrary applied to this court in the instant proceeding for an order preventing the Railroad Commission from making or entering the order prayed for by said city, which it is averred in their said petition and is not herein denied the Railroad Commission presently threatens and proposes to make.

It will be seen from the foregoing that the proceeding before the Railroad Commissioin wherein it proposes to make the order sought to be prevented by the instant pro-

ceeding was not that of providing for the separation of grades at an isolated grade crossing along the line of an already established railroad with incidental damage to property owners immediately contiguous thereto, but it was a proceeding undertaken as a part of and as incidental to a general series of proceedings over which the Commission had already assumed jurisdiction looking to the transposition of the main line of a transcontinental railway from its former location on Fourth Street in the city of San Jose, which it had occupied for many years, to another location in the western portion of said city, such transposition when completed to traverse the entire length thereof from north to south, to occupy exclusively streets and highways in said city theretofore in use for private purposes by the owners of property abutting thereon, and to complete the closure of such streets by the construction of elevated grade crossings, some eight or more in number, and by the placement and use of elevated railroad tracks and lines between such separated grade crossings along the lines of such affected streets, of such height and width as to render impossible the further use of the same for ingress and egress by the abutting property owners thereof. It is plainly to be seen that if the order of the Railroad Commission in the instance of the Julian Street crossing for which said city prays and which the Commission proposes to make shall be sustained it will be followed by the institution of similar proceedings and by the making of similar orders with particular relation to each and all of the other proposed elevated grade crossings along the entire length of the transposed railway within said city, with the consequent fixation of the damages sustained by individual property owners along the entire length of such construction in the course of which elevated grade crossings are to be established throughout the entire length of said railroad within the corporate limits of said city. The respondent seeks to justify its proposed action in the making and enforcement of said order by reliance upon the provisions of sections 22 and 23 of article XII of the state Constitution and upon the further provisions of the Public Utilities Act and the amendments thereto, adopted by the state legislature in assumed conformity with the powers conferred upon it by the aforesaid provisions of the state Constitution. Section 22 of article XII of the Constitution provides for the creation and continuity of a Rail-

road Commission. Said section proceeds to provide that said Commission when so created shall have the power to establish rates of charges for the transportation of passengers and freight by railroads and other transportation companies, and shall have the power to examine the books, records and papers of all railroad and other transportation companies; to hear and determine complaints against railroad and other transportation companies, to issue subpoenas, to administer oaths, to take testimony and to punish for contempt in the same manner and to the same extent as courts of record. The section further provides that, ''No provision of this Constitution shall be construed as a limitation upon the authority of the legislature to confer upon the Railroad Commission additional powers of the same kind or different from those conferred herein and which are not inconsistent with the powers conferred upon the Railroad Commission in this Constitution, and the authority of the legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this Constitution.'' Section 23 of said article of the state Constitution provides for and defines public utilities which are to be subject to such control and regulation by the Railroad Commission as may be provided by the legislature; and having done this proceeds to state that the Railroad Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities in the state of California and to fix the rates to be charged for commodities furnished or services rendered by public utilities as shall be conferred upon it by the legislature and the right of the legislature to confer powers upon the Railroad Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provisions of the state Constitution. In assumed compliance with the plenary grant of power embraced within the foregoing two sections of the state Constitution, the substance of which is above quoted, the legislature proceeded in the year 1915 to adopt and has from time to time since that date sought to amend what is known as the Public Utilities Act. By the terms of section 43, subdivision (b) of said act it is provided that, ''The Commission shall have the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and protection of each crossing of one railroad by another railroad

or street railroad, and of a street railroad by a railroad, and of each crossing of a public road or highway by a railroad, or street railroad and of a street by a railroad or *vice versa,* subject to the provisions of section 2694 of the Political Code so far as applicable, and to alter, relocate or abolish any such crossing, and to require, where in its judgment it would be practicable, a separation of grades at any such crossing heretofore or hereafter established and to prescribe the terms upon which such separation shall be made and the proportions in which the expense of such construction, alteration, relocation or abolition of such crossings or the separation of such grades shall be divided between the railroad or street railroad corporations affected or between such corporations and the state, county, municipality or other political subdivision affected.'' The Public Utilities Act further provides in the first paragraph of subdivision (c) of said section: ''The commission shall have power in accordance with the procedure provided in this subsection to fix the just compensation to be paid for property or any interest in or to property to be taken or damaged in the separation of grades at any crossing specified in subsection (b) hereof, or for property or any interest in or property to be taken or damaged in the construction, alteration or relocation, under the order or with the approval of the commission, of elevated tracks or subways for any railroad or street railroad over or under any public road, street, highway or private right of way, or of any public road, street or highway over or under the tracks of any railroad corporation or street railroad corporation; and upon the payment of the just compensation so fixed to make a final order of condemnation as hereinafter provided.'' Paragraph 3 of said subdivision (c) of said act contains a provision for the issuance of an order to show cause directed to the institution or persons publicly or privately affected or to be affected by the making of the orders provided for in the previous subdivision, directing them to appear and show cause, if any they have, ''why the commission should not proceed after hearing to fix the just compensation to be paid for the acquisition of or damage to the property and interest in or to property specified in said petition or order on the commission's own motion, to designate the party or parties to the proceeding who shall pay such compensation, and the owners and claimants to whom such compensation shall be paid, and

to make its final order of condemnation'', and further provides that upon the hearing of such order to show cause, "the commission shall have full and complete jurisdiction . . . to fix the just compensation to be paid for the acquisition of or damage to any property or interest in or to property specified in the petition or order on the commission's own motion, to designate the party or parties to the proceeding who shall pay such compensation and the owner or claimant to whom such compensation shall be paid and to make its final order of condemnation''. It is under the foregoing provisions of the Public Utilities Act that the Railroad Commission is seeking to justify the order sought to be prevented by the institution of the instant proceeding.

The question thus immediately presented for our determination under the foregoing contentions of the parties to this proceeding is as to whether or not the legislature has attempted under the foregoing provisions of the Public Utilities Act to vest in the Railroad Commission the exclusive right and power to fix the just compensation to be paid for property or any interest held in private ownership proposed to be taken or damaged in the separation of grade crossings or to be constructed in the course of and as incidental to the transposition of a railroad line from one portion of a city to another, and to adopt and make effectual a final order of condemnation in the course of such undertaking when it appears that the property injuriously affected and sought to be condemned is not the property of a public utility but is the property of private persons; and, if so, whether the said sections of the Public Utilities Act in their attempted enforcement against the petitioners herein is constitutional; or whether such private property owners thus injuriously affected have the right, under the provisions of section 14 of article I of the Constitution, to require that their private property and interest shall not be taken or damaged for public use otherwise than in a proceeding in eminent domain and after a jury trial in a court of competent jurisdiction. It is contended by the respondent that this question has been set at rest by the decision of this court in the case of *City of San Jose* v. *Railroad Commission,* 175 Cal. 284 [165 Pac. 967, 969] ; but an examination of the record in that case discloses that while it was decided therein ''that the control of the manner of constructing railroad crossings is a vital and material part of the regulation of railroads and

is germane to that subject it is too evident to need supporting argument'', and that ''the right of apportionment of the cost by the commission to the parties benefited by the crossing is a proper element of this cognate power'', the rights and property interests of private persons were in nowise involved in that case, the litigation therein being confined to a controversy between the railroad company and the municipality as to the proper admeasurement between them of the cost of construction of an elevated railroad crossing, and wherein no private rights of adjacent property owners were involved. It is, therefore, immaterial what the express views of the then members of this court were as to the powers with which the Railroad Commission was invested by the foregoing provisions of the Constitution and terms of the Public Utilities Act, since it may be conceded that in proceedings for the elevation of grade crossings or for the valuation and acquisition of the property of public utilities or municipal corporations the Commission has acquired and may exercise to the fullest extent the plenary powers impliedly given by the foregoing terms of the state Constitution and expressly granted by the above-quoted provisions of the Public Utilities Act. It is significant, however, in this immediate connection to take note of the amendment to article XII of the state Constitution in the year 1924 by the addition thereto of section 23(a), which provides: ''The railroad commission shall have and exercise such power and jurisdiction as shall be conferred upon it by the legislature to fix the just compensation to be paid for the taking of any property of a public utility in eminent domain proceedings by the state or any county, city and county, incorporated city or town, municipal water district, irrigation district or other public corporation or district, and the right of the legislature to confer such powers upon the railroad commission is hereby declared to be plenary and to be unlimited by any provision of this Constitution. All acts of the legislature heretofore adopted which are in accordance herewith are hereby confirmed and declared valid.'' It would seem to be clear that by virtue of this latest amendment of the state Constitution relative to the powers with which the Railroad Commission may be invested by the state legislature that the only power which is thereby expressly conferred upon the Railroad Commission is the right to exercise the power of eminent domain in cases and proceedings

involving the taking of property of public utilities and the fixing of the just compensation to be paid for the taking of such property. If the maxim *expressio unius est exclusio alterius* is to be given modern application to the interpretation of Constitutions and of statutes this would seem to be the precise and proper place for such application. We are not entirely left in the dark, however, with reference to what the framers of the counstitutional provisions embodied in article XII of the state Constitution intended to be the extent and limitations of the grant of power to the Railroad Commission therein contained. In the case of *Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 647 [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119, 1127], the question of the scope and intent of the provisions of article XII of the Constitution, in so far as an attempted enforcement thereof might come in conflict with the provisions of section 14 of article I of the Constitution with relation to the taking of private property for a public use, was directly involved in said decision. Without undertaking to review herein the facts which called for the exhaustive review of the provisions of the Constitution and of the Public Utilities Act to be found embodied in that leading case, it will suffice to set forth that substance of the conclusion arrived at by this court in declaring that the order under review in that case was in excess of the jurisdiction of the Railroad Commission. This court stated that the exercise of the police power in the regulation of public utilities conferred by the terms of said Constitution must be subject to the application of certain fundamental principles which may not be disputed. "The first of these is that this power goes merely to the regulation of the public utility, and that when an order passes beyond proper regulation it amounts to a taking of the property and the order is then referable not to the police power, but to the power of eminent domain. The second of these is that this regulatory power falls into three natural subdivisions. 1. The right to regulate tolls and charges, to the end that fair compensation may be returned and excessive charges be forbidden; 2. The right to prevent discrimination upon the part of the public utility directed against those who employ it, or make use of its agencies, or the commodity which it furnishes; 3. The right to make orders and to formulate rules governing the conduct of the public utility, to the end that its efficiency may be built up

and maintained and the public and its employees be accorded desirable safeguards and conveniences. Beyond these matters regulation, as regulation, does not and from the very meaning of the word cannot go. Nor is it of consequence that the law or order be in terms and in form regulatory, if, in effect, it is a taking of property or a deprivation of the use of property within the meaning of the Constitution. No public convenience, no public necessity, however urgent, will justify such a taking.'' After thus declaring the fundamental principles and the limitations thereon underlying the creation of the Railroad Commission and the authority granted by the Constitution to the legislature to further define its functions, the court proceeded to a discussion as to how far the legislative body had gone or could go in the conferring upon the Railroad Commission the power to take or order taken property for public use. In so doing, and after a full review of the foregoing provisions of the Constitution and of the Public Utilities Act and of the facts of the particular case, with citation of many other cases applicable thereto, the court arrived at the following conclusion as to the powers conferred upon the legislature with respect to the properties of public utilities when sought to be diverted to another public use: ''Among those powers is that which authorizes the commission to act as a tribunal in the exercise of the power of eminent domain and to fix compensation under its awards. This clearly is a power at variance with that constitutional provision above quoted, which declares that compensation for the taking of property shall be assessed by a jury and paid into court. It is the equivalent of saying that *in the case of public utilities* the power of eminent domain shall be exercised and damage assessed by the railroad commission, *while the owners of all other kinds of property shall have this assessment* made *in court by a jury.*'' We gather from the foregoing language that it was the intention of the court in this leading case and exhaustive opinion to declare the constitutional purpose in its foregoing provisions to confer legislative power to invest the Railroad Commission with the exercise of eminent domain in so far as the attempted exercise of such power had relation to taking or damage of the properties of public utilities, but that as to the owners of private property their rights and interests therein when sought to be taken for a public use were still under the pro-

tection of section 14 of article I of the Constitution guaranteeing to them the right of a trial by jury and the payment of compensation into court previously to the proposed taking or damage of their property for a public use. In considering the Eshleman case it may be timely to note that it furnishes an answer to another and very important contention of the respondent in the instant case. It is the contention that the Commission by the petition of the city of San Jose with respect to the construction of an elevated and separate grade crossing at the intersection of Julian and Center Streets, and by its proposed order granting the same, has not been asked and does not intend to fix damages or award compensation to the petitioners herein for whatever injuries or losses they or either of them may sustain as to that portion of their described properties which abut upon Center Street south of said intersection. The record herein, however, discloses that the concrete structure which the Commission has been asked and proposes to order the railroad company to construct in order to create a street subway and overhead railroad at said intersection is of such character as shown by the plans and specifications thereof, as will completely occupy the intersection of said streets extending such distances along Julian Street and across the width thereof and of Center Street and of such depth and height as will completely and effectually close and cut off all possibility of ingress into and egress from Center Street on the part of the hitherto users thereof, and will destroy whatever uses these private property owners have been making and are entitled to make of said street. In a word, the execution of the order which the Commission proposes to make and require the railroad company to comply with will *eo vigore* take, damage and destroy whatever property rights and interests these property owners have in the uses of said street. The final and pivotal point of the decision in the Eshleman case was to the effect that granting to the Railroad Commission the power to exercise the right of eminent domain in dealing with the properties of public utilities, it had been given no power to condemn even such properties without the fixation in their order of compensation for the property so to be taken. The concluding sentence of the opinion of the court in that case and in dealing with that question is: "9. That the order in question admittedly gives no compensation for the taking of petitioner's property

and is therefore void by force and by virtue of the Constitution of the state and of the United States." This is the precise situation presented in the instant case. We might gain some further light upon this subject from a review of the case of *East Bay etc. Dist.* v. *Railroad Com.,* 194 Cal. 603 [229 Pac. 949], did space and the limits of this opinion permit. It will suffice, however, to state that this court in that case and in construing section 47b of the Public Utilities Act, wherein the legislature had undertaken to confer upon the Railroad Commission certain powers and impose certain duties in the way of the valuation of the properties of public utilities when sought to be taken for municipal purposes, held that such attempted grant of power was not germane to the subject of the regulation of railroads and other public utilities under the terms of the aforesaid provisions of the state Constitution, however plenary its grant of power to the legislature might be. In that case also occurs an interesting discussion of the history of the adoption of section 23a of article XII of the Constitution, which seems to confine the power of the Railroad Commission in the exercise of the right of eminent domain to certain designated political subdivisions of the state and wherein this court concluded that such legislative effort as was undertaken by section 47b of the Public Utilities Act was not germane to the subject of the regulation of public utilities contemplated by the foregoing constitutional provisions.

It has been suggested that the property rights and interests of private persons under the provisions of section 14 of article I of the state Constitution are no more sacred or entitled to consideration than the properties of public utilities, and that it would be but a short advance step to hold that the taking or damage of their properties also, without jury trial and the previous payment of compensation into court, would be germane to the regulatory powers with which the Commission is invested, particularly in the matter of the separation of grade crossings, with whatever of consequent injury to or destruction of private property might result therefrom. We cannot agree with this contention in the light of the long history which lies behind the enactment of section 14 of article I of the state Constitution and of the rights and interests of the private individual which have been thereby safeguarded. To say that these

constitutional rights and guaranties are to be disregarded merely because it is to the interest of a municipality or a railroad to construct a separated grade crossing somewhere would be to go farther in the avoidance of this essential constitutional guarantee than any case to which we have been referred in this state or elsewhere has ever gone.

We therefore conclude:

1. That the Railroad Commission has been granted power under the provisions of sections 22 and 23 of article XII of the Constitution and of section 43a of the Public Utilities Act to order the creation and construction of separated railroad grade crossings, subject to the right of the owners of private property to have their rights and interests in their private property taken or damaged thereby determined and the compensation therefor fixed and paid as provided in section 14 of article I of the Constitution and not otherwise.

2. That the Railroad Commission has power in providing for such construction to order the municipality to proceed in the manner provided by law to close such public streets as may be required in order to effectuate the order of the Commission providing for the construction of such crossing; and also has power to order the railroad company to institute proceedings in eminent domain for the condemnation of such of the property of private owners as may be taken or damaged as a result of the making and execution of such order and the fixation and payment of compensation therefor under the provisions of section 14 of article I of the state Constitution.

3. That the Railroad Commission has no power to make or direct the execution of any order under the aforesaid provisions of sections 22, 23 and 23a of article XII of the state Constitution or of section 43a of the Public Utilities Act, which shall either by its terms provide for or by the execution thereof effectuate the taking or damage of the private property of private persons otherwise than under the provisions of section 14 of article I of the state Constitution, or which shall provide for or effectuate the taking or damage of such private property without compensation.

Let the writ issue as prayed for.

Langdon, J., and Curtis, J., concurred.

SEAWELL, J., Concurring.—Something has been said in both the main and dissenting opinion that private property is not hedged in by any sanctity that does not also include corporate property. While this may be so as a general statement of law, I am inclined to think, however, that from its very genesis the taking of private property for public purpose without consent of the owner was looked upon in the eyes of the law as entailing more serious results than would be the taking of corporate property, where the habitation of the citizen is not involved. I am also mindful of the large number of fatalities which occur annually at railroad crossings, and which admonitions of the courts seem to be unable to reduce. I appreciate that it is not a money compensation, but the prevention of the taking of life and limb, which is the real objective of the law in this class of cases, and that some reasonably expeditious method ought to be employed whereby the great evil so familiar to us all may be, at least, reduced to a minimum, if not entirely prevented. While this is so, I am not persuaded that the people have by constitutional provision provided that private property may be taken upon the order of a commission, denying to the owner the right to have its value fixed and determined by court and jury. This is a very old and sacred right, which has been jealously guarded by constitutional law for many years, and I am disposed to hold to its salutary purpose until a different rule is expressed in unmistakable language. I therefore concur in the main opinion.

PRESTON, J., Dissenting.—I dissent.

The city of San Jose, acting under section 43c of the Public Utilities Act (Stats. 1915, chap. 91, p. 115; Stats. 1917, chap. 209, p. 320; Stats. 1927, p. 1215), applied to respondent Railroad Commission for an order fixing the just compensation to each of the petitioners and others for damages which would be done to their respective properties by the construction and maintenance of a subway under Center Street in said city made by the depression of Julian Street so as to allow traffic at that point to pass under the tracks of the Southern Pacific Railroad laid and to be laid along said Center Street.

Respondent entertained the petition and issued a notice to the property owners affected thereby, fixing the day of hearing. Petitioners retaliated by the bringing of this proceeding alleging that said section 43c was in contravention of section 14, article I of the Constitution in that it authorized the taking of private property for a public use without just compensation therefor, assessed by a court and jury, having first been made to them. An alternative writ of prohibition issued upon their petition. A return has been made thereto and the validity of said section of the utilities act presents the sole legal question for our consideration.

The background of the controversy lies in the fact that the Southern Pacific Company has heretofore operated its main line through the city of San Jose over tracks laid on Fourth Street, crossing other city streets, county roads and a state highway at grade. The Fourth Street franchise having expired, the company applied to the city of San Jose for a new franchise, which was granted April 16, 1928, by Ordinance 2174. The substance of this grant was to give a new fifty-year franchise for a transposition and relocation of said lines of said company, with a new double track main line to leave the old line at Polhemus Street and follow the alignment of College Park to Santa Cruz Branch along Center Street to a point near San Carlos Street; thence southerly over a new line to be constructed on a private right of way, joining the existing main line near Lick Station. The whole length of the new line is to be approximately five miles, about half of which is south of the city limits of San Jose. Various wye connections are also authorized.

In the construction of the new tracks it will be necessary to cross various thoroughfares of the city and also in the unincorporated portion of Santa Clara County south of the city. The franchise contemplates a change of four existing grade crossings and the elimination of four others by grade separation. Authority is also given to construct seventeen new crossings four of which will be at separated grades. In other words, there will be twenty-five crossings involved, twelve grade crossings, eight grade separations and five crossings without the city. The project, when completed, will abolish eighteen existing grade crossings, four by means of grade separation, eleven by removal of tracks and three by closing of streets. This ordinance also carried with it

mutual covenants on the part of the railroad company and the city among which was that subways at separation of grades should be constructed by the railroad company but the damages done to property owners, other than the railroad company, should be paid by the city.

The Southern Pacific Company accepting the said franchise, applied to respondent Commission for permission to construct the various crossings over the public thoroughfares involved in the relocation of its main line tracks in said city as well as in the unincorporated territory south of the city. The matter was heard beginning October 24, 1928, and on December 5, 1928, respondent authorized the construction and directed that it be carried out. It further directed that the cost of said crossings, including the property damage and future maintenance, be borne in accordance with the terms of said ordinance. It also prescribed that such authority be granted upon the condition that certain streets and alleys in the city be regularly abandoned, among which was Center Street. The city of San Jose, moving to carry out its part of the transaction, made the application above referred to to the Commission to fix said damages and to make the order of condemnation. Petitioners herein each owns property abutting on both Center and Julian Streets. It is also to be noted that the plan contemplates not only the subway on Julian Street under Center Street but also the closing of Center Street and in addition thereto the elevation of the grade of what is now Center Street and the taking of a strip of property from each of the petitioners to accommodate the double tracks which are to be laid along said street when abandoned.

It will thus be noted that at least three independent causes will produce serious injuries to the property of petitioners. However, we are here concerned only with the question of construction of the subway. Respondent Commission does not propose to levy or assess the damages resulting from the other injuries to petitioners' property.

In response to a well-founded public demand, the legislature, by the enactment of sections 43a, 43b and 43c of said Public Utilities Act, forbade the further construction of railroad crossings at grade and set in operation elaborate machinery authorizing the elimination of grade crossings and providing for the apportionment of the cost

thereof between the railroad and the governmental agency or agencies involved. Section 43c gives in detail the procedure to be followed to bring about a hearing to fix the damages done to the property taken or injured in the separation of grades and provides that the commission itself may assess and award the damages suffered by such property owners and when said damages are assessed and paid may make a final order of condemnation.

The source of authority for said section must be found in sections 22 and 23 of article XII of the Constitution. The first named section creates the Railroad Commission and sets forth its power to make and regulate rates and charges for transportation. It contains this significant paragraph: "No provision of this Constitution shall be construed as a limitation upon the authority of the Legislature to confer upon the Railroad Commission additional powers of the same kind or different from those conferred herein which are not inconsistent with the powers conferred upon the Railroad Commission in this Constitution, and the authority of the Legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this Constitution."

Section 23 defines the term public utility, enumerates the corporations that may be claimed as such and provides for the control of such further corporations or associations as may be declared public utilities by the legislature. It also contains this significant language: "The Railroad Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the Legislature, and the right of the Legislature to confer powers upon the Railroad Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution."

In anticipation of the very question we have before us, the legislature provided in said section 43c, subdivision 8, of said act, as follows: "The Legislature hereby declares that subsection (c) hereof is enacted as a germane and cognate part of and as an aid to the jurisdiction of the Railroad Commission in the supervision and regulation of railroad and street railroad corporations."

The fact seems clearly established that power rests under these provisions of the Constitution in the Railroad Commission to direct and control the manner of constructing railroad crossings, together with the right to direct the separation of grade thereat and to apportion between the railroad and the governmental agency or agencies involved, the cost thereof. (*City of San Jose* v. *Railroad Com.*, 175 Cal. 284, 288, 289 [289 Pac. 967, 969].)

In the case just cited the court, on facts similar to those here, among other things, said: "That the control of the manner of constructing railroad crossings is a vital and material part of the regulation of railroads and is germane to that subject is too evident to need supporting argument. The right of apportionment of the cost by the commission to the parties benefited by the crossing is a proper element of this cognate power."

Referring to the above sections of the Constitution, the court in that cause also said: "Having thus abdicated their police powers with respect to the regulation of public utilities, the people of that city have lost such protection as might, under other circumstances, be afforded by the parts of the Constitution cited in their behalf, because sections 22 and 23 of article XII, by their plenary provisions, exclude all considerations of other parts of the Constitution, if any there be, conflicting with or contradictory to the Public Utilities Act, if only the matters of which that statute treats are cognate and germane to the subject of regulation of public utilities."

The court quoted approvingly from the case of *Pacific Tel. & Tel. Co.* v. *Eshleman*, 166 Cal. 640, 658 [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119], where Mr. Justice Henshaw used the following language: "We regard the conclusion as irresistable that the Constitution of this state has in unmistakable language created a commission having control of the public utilities of the state, and has authorized the legislature to confer upon that commission such powers as it may see fit, even to the destruction of the safeguards, privileges, and immunities guaranteed by the Constitution to all other kinds of property and its owners." Mr. Justice Sloss, delivering the concurring opinion, said: "If the Railroad Commission has acted in conformity with the powers granted to it by

the legislature, the validity of its order cannot be questioned in this court or elsewhere under a claim of violation of any provision of the state Constitution other than the provisions relating to the Railroad Commission. This statement is, however, to be taken subject to the qualification that the powers conferred by the legislature on the Railroad Commission must be such as are cognate and germane to the purposes for which the Railroad. Commission was created, i. e., the regulation and control of public utilities.'' (See, to the same effect, *Civic Center Assn.* v. *Railroad Com.*, 175 Cal. 441 [166 Pac. 351]; *City of Pasadena* v. *Railroad Com.*, 183 Cal. 526, 533 [10 A. L. R. 1425, 192 Pac. 25]; *San Bernardino* v. *Railroad Com.*, 190 Cal. 562, 565 [213 Pac. 980].

The net result of the holding in said causes is to concede to the Commission compulsory authority over cities, counties and the state highway commission in the matter of the construction of separated grades and apportionment of the costs thereof as an incident to its regulatory powers over public utilities. It seems but a mere step forward in the same direction to concede to the legislature the power to provide that the Commission may also, in any specific instance, assess the damages done to private property in effecting such separation of grades as an incident to such regulatory power.

The chief ground urged by petitioners against the validity of said section is that it authorizes the Railroad Commission to interfere with private property rights. But we have just noted that in a matter such as the one under review the Commission may direct the action of sovereign agencies such as a municipality, county or highway commission. Are private rights any more sacred? Private property rights are no more sacred than the governmental rights of the state or a county or municipality therein. It is in fact not interference with private property as such but is an effectual carrying out of the regulatory power lodged in the Commission. In order to give the police power full and effective operation, private rights are subplanted so far as involved in the execution of such power.

A moment's contemplation of the situation seems to convince one that this power is germane to the power of regulation. Suppose the Commission should direct the separa-

tion of grades at a given point involving a utility, the state, county and city and should apportion the costs between the said parties. It would have to await the result of two or more condemnation suits and, if private rights could not be interfered with by it, it could not compel either the state agency, county or city, to proceed to sue; the power of regulation in such a situation might become entirely abortive.

Another viewpoint is that in order to determine that the separation of grade is advisable, the cost thereof, which would, of course, include the incidental damage resulting to private property, must be investigated and determined before a proper order can be made in the premises. Why give the Commission this right and deny it the right to fix the amount of such damages suffered by this private property? To deny the Commission the right to carry out the full project is to encumber the law with entanglements and to dissipate its strength.

The essence of the whole question, as above noted, is whether the power conferred is "cognate and germane" to the regulation and control of public utilities. The logical answer to that question is, we think, in the affirmative and, this being true, the legislation must of necessity be valid. In the case of *East Bay M. U. Dist.* v. *Railroad Com.*, 194 Cal. 603 [229 Pac. 949], the court, with great precaution, based its holding upon the ground that the valuation of a public utility for the purposes of eminent domain proceedings "was not cognate and germane to the exercise of any regulatory powers of the commission". The case holds no more than this. Section 23a of article XII of the Constitution is not involved in this proceeding. The object of that section is simply to provide a means of allowing a sovereignty, such as the city or municipality, to acquire a utility and in such case the Railroad Commission is given plenary power to fix the compensation to be paid for the taking.

It is unfortunate that petitioners may not have all the cases arising from injuries to their property determined in one cause or proceeding. But we are here confronted with the question of the validity of a statute of general operation, carrying great remedial benefit to the traveling public and the inconvenience of a particular situation cannot be

accorded controlling weight. Moreover, it is difficult to see how a proceeding in eminent domain could be united with a proceeding to close a street.

The alternative writ heretofore issued should be discharged and the petition for prohibition should be denied.

SHENK, J., Dissenting.—I dissent. I am in harmony with the views expressed by Mr. Justice Preston. The effect of the majority opinion is a distinct backward step in the elimination of grade crossings in this state. The program of the state through its legislature and Railroad Commission to safeguard the life and property of the motoring public is thus greatly delayed by declaring unconstitutional a statute providing for an expeditious and practical method for the separation of grades.

The case of *East Bay M. U. Dist.* v. *Railroad Com.*, 194 Cal. 603 [229 Pac. 949], is not in point. There a public agency not then authorized to invoke the powers of the Railroad Commission under section 23a of article XII of the Constitution was endeavoring to compel the Commission to fix and determine the compensation to be paid by the petitioner in contemplation of eminent domain proceedings against the East Bay Water Co., and it was held that under the provisions of the Constitution in force at the time the relief could not be granted. There condemnation was the sole purpose of the proceeding and no question of the regulation of the public utility was involved. Here the condemnation is merely incidental to the main purpose of regulation and control of the public utility.

Waste, C. J., concurred.

Rehearing denied.

Shenk, J., and Preston, J., dissented.