[No. S135819. June 19, 2006.]

INDEPENDENT ENERGY PRODUCERS ASSOCIATION et al.,
Petitioners, v.
BRUCE McPHERSON, as Secretary of State, etc., Respondent;
ROBERT FINKELSTEIN et al., Real Parties in Interest.

COUNSEL

Nielsen, Merksamer, Parrinello, Mueller & Naylor, James R. Parrinello and Richard D. Martland for Petitioners.

Bill Lockyer, Attorney General, Louis R. Mauro, Assistant Attorney General, Christopher E. Krueger, Vickie P. Whitney and Hiren Patel, Deputy Attorneys General, for Respondent.

Remcho, Johansen & Purcell, Robin B. Johansen, Thomas A. Willis; Utility Reform Network and Michael Peter Florio for Real Parties in Interest.

Bill Lockyer, Attorney General, and James Humes, Chief Assistant Attorney General, as Amici Curiae.

## OPINION

**GEORGE, C. J.**—As in the recent case of *Costa v. Superior Court* (2006) 37 Cal.4th 986 [39 Cal.Rptr.3d 470, 128 P.3d 675] (*Costa*), we granted review in this case after a lower court, in an expedited preelection decision, directed that a proposed initiative measure—in this case, Proposition 80—be withheld from the November 8, 2005, election ballot. Unlike the situation presented to this court in *Costa*, however, in the present case the lower court's action was not based upon a determination that the initiative failed to comply with a procedural requirement relating to the circulation of the initiative petition. Here, the lower court's decision rested upon its conclusion that in light of the subject matter of the initiative measure at issue—which concerned energy regulation and contained several provisions conferring additional regulatory authority upon the California Public Utilities Commission (PUC)—the proposed measure was not one that, under the California Constitution, lawfully could be adopted by a vote of the people through the initiative process but rather was one that could be enacted only by the Legislature. Specifically, the Court of Appeal interpreted article XII, section 5 of the California Constitution—which provides in part that "[t]he Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the [PUC]"—to mean that only the Legislature, and not the electorate through the initiative process, has the authority to enact statutory provisions that confer additional authority upon the PUC. In light of its understanding of this constitutional language, the Court of Appeal held that the provisions embodied in Proposition 80 could not be enacted through the initiative process and ordered the Secretary of State to withhold the measure from the November 2005 election ballot.

At the time the Court of Appeal issued its expedited preelection decision, the period for public inspection of the material to be included in the ballot pamphlet was about to commence. Therefore, the proponents of Proposition 80—real parties in interest in this proceeding—immediately filed an emergency petition for writ of mandate with this court (which we treated as a

petition for review of the Court of Appeal's decision), challenging the conclusion reached by that court and seeking to have the measure restored to the November 2005 ballot. After considering the emergency petition at conference, we unanimously voted to grant review, issuing an order that stated in part: "As the Court of Appeal recognized, California authorities establish that 'it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity.' (*Brosnahan v. Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200].) Because, unlike the Court of Appeal, at this point we cannot say that it is clear that article XII, section 5, of the California Constitution precludes the enactment of Proposition 80 as an initiative matter, we conclude that the validity of Proposition 80 need not and should not be determined prior to the November 8, 2005, election. Accordingly, the Secretary of State and other public officials are directed to proceed with all the required steps to place Proposition 80 in the ballot pamphlet and on the ballot of the special election to be held on November 8, 2005. After that election, we shall determine whether to retain jurisdiction in this matter and resolve the issues raised in the petition."

Pursuant to our order, Proposition 80 was included in the ballot pamphlet and on the election ballot for the November 8, 2005, election. At that election, the voters rejected Proposition 80.

In light of the defeat of Proposition 80 at the November 2005 election, the underlying challenge to that measure itself is moot. Nonetheless, as in *Costa*, we have concluded that it is appropriate for this court to retain the matter and issue an opinion in order to provide guidance for the future on two general issues presented by the case: (1) the circumstances under which preelection review is warranted for the type of challenge to an initiative measure that is presented in this case—a type of challenge that, as we shall explain, is distinguishable in a significant respect from the type of challenge at issue in *Costa*—and (2) the important legal issue whether article XII, section 5, of the California Constitution (hereafter, article XII, section 5) precludes the use of the initiative process to enact statutes conferring additional authority upon the PUC.

For the reasons set forth below, we have reached the following conclusions with respect to these two issues. On the first issue, we explain initially that the general rule set forth in *Brosnahan v. Eu, supra,* 31 Cal.3d 1 (*Brosnahan I*) —recognizing a strong presumption against preelection resolution of a challenge to an initiative measure—is inapplicable to the challenge raised here, because the challenge is not based on the alleged unconstitutionality of

the substance of the initiative measure but rather on the contention that the measure in question is not the *type of measure* that may be adopted through the initiative process. Nonetheless, as we further explain, although preelection resolution of this type of a challenge is not presumptively improper, the challenge here at issue—unlike the type of challenge at issue in *Costa*—generally will not become moot after an election if the measure is adopted, and thus such a claim reasonably is susceptible to judicial resolution either before or after an election. As a consequence, when such a challenge is brought prior to an election, a court should recognize that the need for an expedited preelection resolution of the claim is less compelling than with regard to the type of claim at issue in *Costa*. Accordingly, in such a case a court should take into consideration the availability of postelection relief in deciding whether it is preferable to resolve the issue in the often charged and rushed atmosphere of an expedited preelection review, or instead to leave the challenge for resolution with the benefit of the full, unhurried briefing, oral argument, and deliberation that generally will be available after the election.

On the second issue, we conclude that the Court of Appeal erred in interpreting article XII, section 5 as precluding the people, through the initiative process, from adopting a statutory provision that grants additional authority to the PUC. Past California decisions establish that language in the California Constitution recognizing the authority of the Legislature to take specified action generally is interpreted to encompass the exercise of such legislative power either by the Legislature or by the people through the initiative process. Although the Court of Appeal was of the view that the specific wording of article XII, section 5 required an exception to this general proposition, as we shall explain the language of that constitutional provision is at most ambiguous. Particularly when this language is read in light of the origin and purpose of the provision, it is clear that the constitutional provision cannot reasonably be interpreted to bar the people, through the initiative process, from enacting a statute or statutes conferring additional authority upon the PUC.

Accordingly, we conclude that the judgment of the Court of Appeal must be reversed.

# I

For the past decade and a half, the subject of energy regulation and deregulation has been a significant issue for California government. As explained in the analysis of Proposition 80 prepared by the Legislative Analyst (Voter Information Guide, Special Elec. (Nov. 8, 2005) analysis of Prop. 80 by Legis. Analyst, pp. 50–53 Voter Information Guide)), in the early 1990's California began a process of restructuring electricity service by

introducing competition in the generation of electricity, with the ultimate objective of achieving lower rates for consumers. In 1996, the Legislature adopted a deregulation plan that among other things (1) required the large investor-owned utilities (IOU's) that generated and supplied the bulk of electricity within California—including Pacific Gas and Electric Company, Southern California Edison, and San Diego Gas & Electric—to sell their fossil fuel power plants to independent generators, and (2) instituted a transition plan under which the PUC would continue to regulate the rates charged by IOU's to electricity customers for an interim period, but that was intended ultimately to result in rates determined in a competitive market in which customers alternatively could choose to have an IOU purchase and deliver electricity on their behalf or instead to purchase electric power directly from so-called independent electric service providers (ESP's). (In addition to IOU's and ESP's, electricity also is provided to customers in some areas of California by publicly owned electric utilities, such as the Los Angeles Department of Water & Power and the Sacramento Municipal Utility District.) By the late 1990's, a number of ESP's had begun operation in California, generally serving large industrial and commercial businesses and some state and local governmental entities. The ESP's were required to register with the PUC for licensing purposes, but their rates and terms of service explicitly were *not* subject to PUC regulation.

In 2000 and early 2001, an energy crisis arose in California in part as a result of sharply increasing electricity demand, lagging investment in new power plants, and other factors that led to electricity shortages and steeply rising electricity prices. In response to the energy crisis, the state began to purchase electricity on behalf of the IOU's by entering into long-term electricity contracts, and suspended several aspects of the energy deregulation plan pending the expiration of such contracts.

The initiative measure that ultimately was designated Proposition 80 was drafted to address a number of perceived problems created by the state's existing energy deregulation plan. The initiative measure included numerous provisions dealing with a range of subjects. For purposes of the issues that we address in this proceeding, the most significant feature is the measure's proposal to confer upon the PUC additional "jurisdiction, control, and regulation" over the ESP's, specifying that the scope of such PUC regulation would include the enforcement of requirements relating to energy procurement, contracting standards, and energy efficiency.[1] The proponents submitted

---

[1] Among other changes, the initiative proposed (1) to add to section 218.3 of the Public Utilities Code—the existing section defining "electric service provider"—the following sentence: "An electric service provider is subject to the jurisdiction, control, and regulation of the commission, and the provisions of this part, pursuant to subdivision (f) of Section 394," and (2) to add a new subdivision (f) to Public Utilities Code section 394, providing: "Registration

a copy of the measure to the Attorney General for preparation of a title and summary, and thereafter circulated for signature a petition setting forth the initiative.[2]

On June 20, 2005, the Secretary of State certified that the measure had obtained the requisite number of signatures to qualify for the ballot, and designated the matter as Proposition 80 to be submitted to the voters at the November 8, 2005, special election. Shortly thereafter, on June 29, 2005, petitioners Independent Energy Producers Association, California Retailers Association, and Steven Kelly (hereafter petitioners) filed an original petition for writ of mandate in the Court of Appeal, seeking preelection review of the measure and contending that in light of the provisions of article XII, section 5, "[a] constitutional amendment would be required to confer on the people the right to use the statutory initiative to implement [the] changes" proposed by Proposition 80. The petition requested that the Court of Appeal issue a writ directing the Secretary of State to refrain from submitting the initiative measure to the voters.

On July 5, 2005, the Court of Appeal, after an initial review of the petition, issued an alternative writ of mandate. Because the deadline for submitting the ballot pamphlet to the state printer for the November 8, 2005, election was August 15, 2005, the court ordered expedited briefing and oral argument, directing real parties in interest to file a return by July 11 and petitioners to file a replication by July 15, and setting oral argument for July 20. The Court of Appeal heard oral argument as scheduled, issuing its opinion two days later on July 22, 2005.

---

with the commission is an exercise of the licensing function of the commission, and registration by an electric service provider constitutes agreement of the electric service provider to the jurisdiction, control, and regulation of its rates and terms and conditions of service by the commission. The commission shall exercise such jurisdiction, control, and regulation of electric service providers in their provision of electrical service in the same manner as its exercise of jurisdiction, control, and regulation of electrical corporations, including, but not limited to, enforcement of: energy procurement and contracting standards and requirements; resource adequacy requirements; energy efficiency and demand response requirements; renewable portfolio standards; and appropriate assignment of costs among customers to prevent cost shifting." (Voter Information Guide, *supra*, text of proposed laws, Prop. 80, §§ 3, 9, pp. 73, 75.)

[2] The title and summary prepared by the Attorney General for the initiative measure stated as follows: "Electric Service Providers. Regulation. Initiative Statute. [¶] Subjects electric service providers, as defined, to control and regulation by California Public Utilities Commission. [¶] Imposes restrictions on electricity customers' ability to switch from private utilities to other electric providers. [¶] Provides that registration by electric service providers with Commission constitutes providers' consent to regulation. [¶] Requires all retail electric sellers, instead of just private utilities, to increase renewable energy resource procurement by at least 1% each year, with 20% of retail sales procured from renewable energy by 2010, instead of current requirement of 2017. [¶] Imposes duties on Commission, Legislature and electrical providers." (Voter Information Guide, *supra*, official title and summary of Prop. 80, p. 50.)

Initially, with regard to the procedural question of preelection review, the Court of Appeal noted that although as a general rule court review of an initiative measure is more appropriate after an election, "this general rule applies only to a claim that a substantive provision of the initiative is unconstitutional; it does not apply where the electorate lacks the power to adopt the proposal in the first instance." Because, in the court's view, "Proposition 80 is unquestionably invalid on its face because . . . it runs afoul of a plain and unambiguous provision of our state Constitution . . . that effectively precludes use of the initiative process to accomplish what Proposition 80 proposes to do," the Court of Appeal concluded that "preelection review is proper, indeed essential."

In reaching its determination on the merits of the constitutional claim, the appellate court concluded that the language of article XII, section 5 "plainly and unambiguously" grants only the Legislature, and not the people through the initiative process, the power to grant additional authority upon the PUC. Because that court viewed the language of article XII, section 5 as unambiguous, it dismissed the contention of real parties in interest that the background and origin of this constitutional language must properly be considered in interpreting the provision and that such history demonstrates that the language in question cannot reasonably be interpreted as a limitation on the scope of the initiative power. Finally, having determined that the provisions of Proposition 80 purporting to confer additional authority upon the PUC could not be adopted by initiative, the Court of Appeal went on to conclude that those provisions were not severable from the remainder of the initiative measure. Accordingly, the court ruled that a writ of mandate should issue directing the Secretary of State to refrain from taking any steps to place Proposition 80 in the ballot pamphlet or on the November 8, 2005, election ballot.

As noted above, after the Court of Appeal issued its opinion, real parties in interest filed an emergency petition for writ of mandate in this court, challenging the Court of Appeal's removal of Proposition 80 from the ballot. Treating the document as a petition for review, we granted review. Observing that "unlike the Court of Appeal, at this point we cannot say that it is clear that article XII, section 5, of the California Constitution precludes the enactment of Proposition 80 as an initiative measure," we concluded that the validity of Proposition 80 "need not and should not be determined prior to the November 8, 2005, election." We directed the Secretary of State and other public officials to proceed with all the steps required to place Proposition 80 in the ballot pamphlet and on the special election ballot, and stated that after the election we would determine whether to retain jurisdiction in this matter and resolve the issues raised in the petition.

Pursuant to our order, the materials related to Proposition 80 were included in the ballot pamphlet and the voters were given the opportunity to vote on the measure at the November 8, 2005, special election. At that election, Proposition 80 was defeated.

Because Proposition 80 was not adopted by the voters, the legal challenge to the measure is now moot. Nonetheless, as in our recent decision in *Costa, supra,* 37 Cal.4th 986, 1005, we conclude that it is appropriate to retain jurisdiction and issue an opinion in this matter to provide future guidance on two issues: (1) the circumstances under which preelection review is appropriate for the type of constitutional challenge here at issue, and (2) the question whether article XII, section 5 precludes the use of the initiative power to confer additional authority upon the PUC.

## II

■ As noted above, our order granting review cited and relied upon the general statement in *Brosnahan I, supra,* 31 Cal.3d 1, 4, that "it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity." As we pointed out in our recent decision in *Costa, supra,* 37 Cal.4th, 986, 1005, however, "in *Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142 [90 Cal.Rptr.2d 810, 988 P.2d 1089] (*Senate v. Jones*), we noted that decisions after *Brosnahan I* 'have explained that this general rule applies primarily when a challenge rests upon the alleged unconstitutionality of the substance of the proposed initiative, and that the rule does not preclude preelection review when the challenge is based upon a claim, for example, that the proposed measure may not properly be submitted to the voters because the measure is not legislative in character or because it amounts to a constitutional revision rather than an amendment. [Citations.]' (21 Cal.4th at p. 1153.)" Under the authorities cited in *Senate v. Jones,* preelection review of an initiative measure may be appropriate when the challenge is not based on a claim that the substantive provisions of the measure are unconstitutional, but rests instead on a contention that the measure is not one that properly may be enacted *by initiative.* (See, e.g., *American Federation of Labor v. Eu* (1984) 36 Cal.3d 687 [206 Cal.Rptr. 89, 686 P.2d 609] [initiative may not be used to apply for the convening of a federal constitutional convention]; *McFadden v. Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787] [initiative may not be used to revise, rather than to amend, California Constitution].) Because the claim raised here is that the California Constitution permits only the Legislature, and not the people through the

initiative process, to confer additional authority upon the PUC, the decisions noted in *Senate v. Jones* establish that preelection review of such a claim is not necessarily or presumptively improper.

■ Nonetheless, although the strong presumption against preelection review does not apply to such a claim, we believe it is appropriate for a court presented with this type of preelection challenge to keep in mind that unlike the type of procedural challenge relating to the petition-circulation process at issue in our recent decision in *Costa, supra,* 37 Cal.4th 986—a type of claim that, as explained in *Costa,* generally can be remedied only prior to an election and that usually will become moot after an election (see *id.* at pp. 1006–1007)—a contention that an initiative measure is invalid because the measure cannot lawfully be enacted through the initiative process is a type of claim that generally will *not* become moot if the initiative is approved by the voters at the election. (See, e.g., *Bramberg v. Jones* (1999) 20 Cal.4th 1045 [86 Cal.Rptr.2d 319, 978 P.2d 1240] [postelection decision invalidating initiative that instructed, and indirectly attempted to coerce, federal and state legislators to propose a specific federal constitutional amendment]; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 349–356 [276 Cal.Rptr. 326, 801 P.2d 1077] [postelection decision invaliding one section of Proposition 115 as a constitutional "revision" that could not be adopted by initiative].) Because this type of claim is potentially susceptible to resolution either before or after an election, there is good reason for a court to be even more cautious than when it is presented with the type of procedural claim at issue in *Costa* before deciding that it is appropriate to resolve such a claim prior to an election rather than wait until after the election. Of course, as this court noted in *Senate v. Jones, supra,* 21 Cal.4th 1142, 1154, potential costs are incurred in postponing the judicial resolution of a challenge to an initiative measure until after the measure has been submitted to and approved by the voters,[3] and such costs appropriately can be considered by a court in determining the propriety of preelection intervention. Nonetheless, because this type of challenge is one that can be raised and resolved after an election, deferring judicial resolution until after the election—when there will be more time for full briefing and deliberation—often will be the wiser course.

As explained above, in the present case the Court of Appeal intervened prior to the election and directed that the initiative measure be removed from the ballot only after concluding that the measure was "unquestionably invalid on its face." In light of that court's view on the merits, its decision to

---

[3] " 'The presence of an invalid measure on the ballot steals attention, time, and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure.' " (*Senate v. Jones, supra,* 21 Cal.4th at p. 1154.)

intervene prior to the election is understandable. Because, unlike the Court of Appeal, from our initial review prior to the election we were not convinced that article XII, section 5 properly should be interpreted to preclude the enactment of Proposition 80 through the initiative process, we granted review and directed that the proposition be placed on the November 8, 2005, election ballot, deferring a definitive judicial resolution of the issue until after the election.

## III

In light of the defeat of Proposition 80 at the November 8, 2005, election, the legal challenge to that initiative measure is moot. Nonetheless, because the Court of Appeal decision—although no longer published or citable in light of our grant of review (Cal. Rules of Court, rule 976(d))—potentially may cast doubt on the constitutional viability of any future initiative measure that purports to confer additional authority upon the PUC (an issue likely to recur), and because it appears preferable to have the question of the proper interpretation of article XII, section 5 resolved in a setting that affords the opportunity for full briefing, oral argument, and unrushed deliberation, we have concluded it is appropriate to retain the case to resolve the issue by opinion in this proceeding. For the reasons discussed below, we conclude that article XII, section 5 does not preclude the use of the initiative power to confer additional authority upon the PUC.

## A

Although the question before us ultimately involves the proper interpretation of article XII, section 5, the resolution of this issue implicates the meaning and scope of additional provisions of the California Constitution—article IV, section 1, and article II, section 8, relating to the people's initiative power.

California Constitution article IV, section 1 (hereafter, article IV, section 1) provides in full: "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, *but the people reserve to themselves the powers of initiative and referendum.*" (Italics added.)

California Constitution article II, section 8, subdivision (a) (hereafter, article II, section 8) provides in full: "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them."

■ In describing the initiative power in *Associated Home Builders etc. Inc. v. City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473] this court explained: "The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's. Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it 'the duty of the courts to jealously guard this right of the people' [citation], the courts have described the initiative and referendum as articulating 'one of the most precious rights of our democratic process' [citation]. '[I]t has long been our judicial policy to apply a liberal construction to this power whenever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' [Citations.]" (18 Cal.3d at p. 591, fns. omitted; see also *Carlson v. Cory* (1983) 139 Cal.App.3d 724, 728 [189 Cal.Rptr. 185] ["In response to this broad constitutional reservation of power in the people, the courts have consistently held that the Constitution's initiative and referendum provisions should be liberally construed to maintain maximum power in the people. [Citations.] Any doubts should be resolved in favor of the exercise of these rights. [Citations.]"].) In addition, past decisions relating to the initiative have explained that "the power of the people [to enact statutes] through the statutory initiative *is coextensive* with the power of the Legislature." (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675 [194 Cal.Rptr. 781, 669 P.2d 17], italics added; see, e.g., *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 253 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

Article XII, section 5—a provision of the article of the state Constitution relating to public utilities—provides in full: "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission [that is, the PUC], to establish the manner and scope of review of commission action in a court of record, and to enable it to fix just compensation for utility property taken by eminent domain."

## B

■ Although the Court of Appeal was of the view that the language of article XII, section 5 quoted above is clear and unambiguous on its face, and can reasonably be interpreted *only* to mean that *the Legislature alone,* and not the people through the initiative process, can confer additional authority and jurisdiction upon the PUC, in our view the language of article XII, section 5 is reasonably susceptible to two alternative interpretations: (1) that, as the

Court of Appeal suggested, the Legislature *and only the Legislature*—notwithstanding the provisions of article IV, section 1 and article II, section 8, recognizing the people's reserved right to enact legislation through the initiative power—has plenary power to confer additional authority and jurisdiction upon the PUC, or (2) that the Legislature *or the electorate exercising its legislative power through the initiative process* "has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the [PUC] . . . ." As we shall explain, the Court of Appeal's limited view of the potential meaning of this provision fails adequately to take into account the numerous California decisions that have held, in a variety of contexts, that language in the California Constitution establishing the authority of "the Legislature" to legislate in a particular area must reasonably be interpreted to include, rather than to preclude, the right of the people through the initiative process to exercise similar legislative authority.

This court's decision in *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245 [279 Cal.Rptr. 325, 806 P.2d 1360] (*Kennedy Wholesale*) is a representative and instructive case in point. In *Kennedy Wholesale*, this court addressed a multi-pronged constitutional challenge to Proposition 99, an initiative measure passed by the voters that increased the tax on cigarettes and other tobacco products and allocated the revenue of the increased tax to meet various tobacco-related problems. The plaintiff's initial claim in *Kennedy Wholesale* was that Proposition 99 violated the provisions of article XIII A, section 3 of the California Constitution (hereafter, article XIII A, section 3), which, in 1991, specified in relevant part: "any change in State taxes enacted for the purpose of increasing revenues . . . must be imposed by an Act passed by no less than two-thirds of all members elected to each of the two houses of the Legislature . . . ." The plaintiff in *Kennedy Wholesale* asserted that these words in article XIII A, section 3 signify "that only the Legislature can raise taxes." (53 Cal.3d at p. 249.)

Although the court in *Kennedy Wholesale* recognized that the literal language of article XIII A, section 3 was susceptible to the plaintiff's proposed interpretation, it rejected the plaintiff's assertion that it was appropriate to enforce this provision "according to its 'plain meaning' without considering the section's history or other indications of the voters' intent" (*Kennedy Wholesale, supra,* 53 Cal.3d at p. 249). The court concluded instead that the provision "is ambiguous when read in the context of the whole Constitution." (*Ibid.*) Pointing to the language of article IV, section 1, reserving to the people the powers of initiative and referendum, the court noted that "[t]o interpret [article XIII A, section 3] as giving the Legislature *exclusive* power to raise taxes would implicitly repeal article IV, section 1, pro tanto. [Article XIII A, s]ection 3, however, does not even mention the

initiative power, let alone purport to restrict it." (53 Cal.3d at p. 249.) The court further reasoned: "[T]o avoid repeals by implication 'we are bound to harmonize . . . constitutional provisions' that are claimed to stand in conflict. [Citation.] In addition, because plaintiff is arguing for a limitation on the initiative power, we must also bear in mind that the initiative power is ' " 'one of the most precious rights of our democratic process' " ' [citations] and that we must *'resolve any reasonable doubts in favor of the exercise of this precious right.'* " (53 Cal.3d at pp. 249–250.)

Having concluded that article XIII A, section 3 was ambiguous when read in the context of the entire Constitution, the court in *Kennedy Wholesale, supra,* 53 Cal.3d 245, went on to consider the voters' intent in adopting article XIII A, section 3 as part of Proposition 13 and observed: "Nothing in the official ballot pamphlet supports the inference that the voters intended to limit their own power to raise taxes in the future by statutory initiative. To the contrary, the arguments in favor of Proposition 13 adopt a populist theme that cannot easily be reconciled with plaintiff's interpretation of the measure." (53 Cal.3d at p. 250.) Accordingly, the court in *Kennedy Wholesale* ultimately concluded that article XIII A, section 3 could not reasonably be interpreted to preclude the voters from utilizing the initiative power to raise taxes. (53 Cal.3d at pp. 250–251.)

Other California cases have reached a similar conclusion when faced with analogous claims. In *State Comp. Ins. Fund v. State Bd. of Equalization* (1993) 14 Cal.App.4th 1295 [18 Cal.Rptr.2d 526] (*State Comp. Ins. Fund*), for example, an insurance company challenged a provision of Proposition 103, a statutory initiative measure authorizing an increase in the rate of the insurance premium tax imposed on insurers pursuant to article XIII, section 28 of the California Constitution. When Proposition 103 was adopted in 1989, article XIII, section 28 provided in pertinent part: "(b) An annual tax is hereby imposed on each insurer doing business in this state . . . at the rates . . . hereinafter specified. . . . [¶] . . . [¶] (d) The rate of the tax to be applied to the basis of the annual tax in respect to each year is 2.35 percent. . . . [¶] (h) The taxes provided for by this section shall be assessed by the State Board of Equalization. [¶] (i) *The Legislature, a majority of all the members elected to each of the two houses voting in favor thereof, may by law change the rate or rates of taxes herein imposed upon insurers.*" (Italics added.)

In *State Comp. Ins. Fund, supra,* 14 Cal.App.4th 1295, the plaintiff insurer contended in part that although article XIII, section 28, subdivision (i),

authorized *the Legislature* to change the rate of taxes otherwise specified by the Constitution itself, the provision did not authorize *the people through the initiative process* to modify such rates. Observing that " '[t]he reserved power to enact statutes by initiative is a legislative power, one that would otherwise reside in the Legislature,' " and that "[a]part from procedural differences, the electorate's lawmaking powers are identical to the Legislature's" (14 Cal.App.4th at p. 1300), the appellate court in *State Comp. Ins. Fund* rejected the insurer's contention. That court concluded that "the constitutional grant of power to the Legislature in article XIII, section 28, subdivision (i), entails a similar grant of power to the electorate to legislate through the initiative process." (*Id.* at p. 1299.) In reaching this conclusion, the court pointedly noted that "[t]he language 'the Legislature may' is found throughout article XIII *and in many other places in the California Constitution. It would be absurd to attribute to the framers of the Constitution an intention to limit the initiative power in the many and varied contexts in which the phrase appears.*" (*Id.* at p. 1300, fns. omitted, italics added.) (See also *Carlson v. Cory, supra,* 139 Cal.App.3d 724, 728–729.)

The Court of Appeal below found *Kennedy Wholesale* and the other cases we have cited distinguishable from the present case, because the constitutional provisions at issue in those cases did not contain the language—"The Legislature has plenary power, unlimited by the other provisions of this constitution . . ."—that appears in article XII, section 5. The Court of Appeal concluded that the quoted language plainly and unambiguously precludes the use of the initiative power to confer additional authority upon the PUC.

In reaching this conclusion, the Court of Appeal initially relied upon a number of dictionaries that define "plenary" to mean "complete," "absolute," or "unqualified," declaring that "the usual and ordinary meaning of the phrase 'plenary power' connotes total power, *to the exclusion of all others.*" (Italics added.) Real parties in interest take issue with the Court of Appeal's understanding of the term "plenary," pointing out that the word "exclusive" does not appear in the dictionary definitions cited by the Court of Appeal, and that in other contexts courts explicitly have rejected the contention that the term "plenary power" means exclusive power. (See, e.g., *Natural Resources v. Upper Val. Landfill* (1997) 167 Vt. 228 [705 A.2d 1001, 1008] ["Defendants argue that by granting the superior court 'plenary powers' . . . , the Legislature intended to grant the superior court exclusive jurisdiction. Defendants' construction is contrary to the plain meaning of 'plenary,' which means 'complete' and 'unqualified,' not exclusive. See Black's Law Dictionary 1038 (5th ed. 1979)"].)

In further support of its reading of the constitutional provision in question, the Court of Appeal maintained that the additional language in article XII, section 5 stating that the Legislature's plenary power is "unlimited by the other provisions of this constitution" can be interpreted *only* to include and preempt the provisions of the California Constitution relating to the initiative power. Real parties in interest argue, however, that it is by no means clear that this language properly must or should be interpreted to refer to or trump the constitutional provision reserving the people's right to enact legislation through the initiative power, pointing out that the Court of Appeal's expansive reading of this language logically would signify that a statute passed by the Legislature pursuant to article XII, section 5 would not be subject to *any* provision of the California Constitution, including, for example, the provision authorizing the Governor to veto a bill approved by the Legislature. (Cal. Const., art. IV, § 10.) Real parties in interest maintain that the language in article XII, section 5 has not been, and reasonably cannot be, interpreted so expansively to exclude the application of provisions like those relating to the initiative power or the gubernatorial veto. (Cf. *S. H. Chase Lumber Co. v. Railroad Com.* (1931) 212 Cal. 691, 702–706 (lead opn. of Richards, J.), 707 (conc. opn. of Seawell, J.) [300 P. 12] [interpreting language of constitutional predecessor of art. XII, § 5 as preserving private property owners' constitutional rights in eminent domain actions as guaranteed by art. I, former § 14 (now art. I, § 19) of the California Constitution].)[4]

Particularly in light of the numerous past California authorities holding that constitutional references to the Legislature's authority to take specified action generally are not interpreted to limit the initiative power, we agree with real parties in interest that the language relied upon by the Court of Appeal is not unambiguous and cannot reasonably be interpreted *only* as having the effect of precluding the people's exercise of their reserved initiative power. Rather, we conclude that the wording of the provision at most creates an ambiguity, and that it is appropriate and necessary to consider the origin and background of this constitutional language to determine whether, in light of the purpose and objective of the constitutional provision, it is reasonable to interpret it in

---

[4] Although petitioners rely upon a passage in *Pacific Telephone etc. Co. v. Eshleman* (1913) 166 Cal. 640, 658–659 [137 P. 1119], indicating that the constitutional language in question should be given a broad and all-encompassing interpretation, later cases—such as *S. H. Chase Lumber Co. v. Railroad Com., supra,* 212 Cal. 691, and a number of more recent decisions of this court interpreting analogous language set forth in article XIV, section 4 of the California Constitution ("plenary power, unlimited by any provision of this Constitution") relating to the Legislature's authority to create and enforce a complete system of workers' compensation (see *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1037–1038 & fn. 8 [25 Cal.Rptr.2d 539, 863 P.2d 784]; *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 342–346 [178 Cal.Rptr. 801, 636 P.2d 1139])—have explained that such constitutional language cannot be given an unreasonably expansive construction unrelated to the purpose and intended scope of the constitutional provision in which that language appears.

the manner proposed by the Court of Appeal. As we shall explain, our examination of the background and purpose of this constitutional provision leads us to conclude that the view adopted by the Court of Appeal is not the most reasonable interpretation of this provision.

The crucial language of article XII, section 5—"[t]he Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission"—derives from a constitutional provision relating to the administrative predecessor of the PUC, the Railroad Commission, that was enacted through a constitutional amendment approved by the voters at a special statewide election held on October 10, 1911. The measure in question—Assembly Constitutional Amendment No. 6 (ACA No. 6)—substantially amended former section 22 of article XII, a provision included in the 1879 Constitution that created and granted specified authority to a state railroad commission.

ACA No. 6 proposed a significant revision of the composition, selection, and power of the then existing Railroad Commission. The measure expanded the number of railroad commissioners from three to five, provided for the appointment of all commissioners by the Governor rather than by election from districts, and spelled out the broad power of the commission to establish rates and to examine the books, records, and papers of all railroad and other transportation companies.[5] The measure also included the following paragraph: "No provision of this constitution shall be construed as a limitation upon the authority of the legislature to confer upon the railroad commission additional powers of the same kind or different from those conferred herein which are not inconsistent with the powers conferred upon the railroad

---

[5] In setting forth the powers of the commission, the measure stated: "Said commission shall have the power to establish rates of charges for the transportation of passengers and freight by railroads and other transportation companies, and no railroad or other transportation company shall charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or freight, or for any service in connection therewith, between the points named in any tariff of rates, established by said commission, than the rates, fares and charges which are specified in such tariff. The commission shall have the further power to examine books, records and papers of all railroad and other transportation companies; to hear and determine complaints against railroad and other transportation companies; to issue subpoenas and all necessary process and send for persons and papers; and the commission and each of the commissioners shall have the power to administer oaths, take testimony and punish for contempt in the same manner and to the same extent as courts of record; the commission may prescribe a uniform system of accounts to be kept by all railroad and other transportation companies." (ACA No. 6.)

commission in this constitution, and the authority of the legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this constitution." (*Ibid.*)

As noted, the voters approved ACA No. 6 at the October 1911 election, and the amended version of article XII, section 22 became part of the Constitution. The constitutional language in question was carried over when article XII, section 22 was amended in 1946 to change the name of the Railroad Commission to the Public Utilities Commission. In 1974, as part of a comprehensive revision of article XII that reorganized and greatly reduced the length and complexity of the prior constitutional provisions related to public utilities, the language initially adopted in 1911 was revised and moved to article XII, section 5, with no change in meaning intended. (See Cal. Const., art. XII, § 9 ["The provisions of this article restate all related provisions of the Constitution in effect immediately prior to the effective date of this amendment and make no substantive change"].) Accordingly, it is appropriate to consider the purpose and intent of this language, as initially incorporated into the California Constitution in 1911, in arriving at the most reasonable interpretation of the present constitutional provision.

In 1911, the election statutes provided for the preparation and mailing to the voters, prior to an election, of a document similar to the current ballot pamphlet, containing the text of each proposed constitutional amendment that would appear on the ballot along with legislatively prepared statements setting forth reasons for and against the adoption of each proposed amendment. (See former Pol. Code, §§ 1195, 1195a, enacted by Stats. 1909, ch. 154, § 1, p. 254, Stats. 1909, ch. 142, § 1, p. 245.) With regard to the constitutional amendment proposed by ACA No. 6, the argument in favor of the measure—after detailing all of the specific changes in the Railroad Commission's composition and powers proposed by the measure—explained the reasons underlying the pertinent language of ACA No. 6 as follows: "Finally, it is proposed to amend the section so as to remove all doubt of the right of the legislature to confer additional powers upon the commission. Under the amendment as presented for adoption, the legislature may give to the railroad commission such powers as it sees fit without any restriction whatever, provided only that the powers thus given are not inconsistent with the powers specifically conferred in the constitution." (Sect. of State, Proposed Amends. to Const. with Legislative Reasons, Special Elec. (Oct. 10, 1911), Reasons Why ACA No. 6 Should Be Adopted.)

The constitutional amendment embodied in ACA No. 6 was part of the reform program of the progressive movement that had gained control of the

California Legislature and the governorship in the preceding election (see Key & Crouch, The Initiative and Referendum in Cal. (1938) pp. 433-436), and additional insight into the background and purpose of the constitutional language in question is provided by a passage contained in the first inaugural address of Governor Hiram Johnson, the leader of the progressive movement, that was delivered on January 3, 1911. In a portion of the address discussing the so-called railroad question, Governor Johnson stated in part: "For many years in the past shippers, and those generally dealing with the Southern Pacific Company, have been demanding protection against the rates fixed by that corporation. The demand has been answered by the corporation by the simple expedient of taking over the government of the State; and instead of regulation of the railroads, as the framers of the new Constitution [that is, the Constitution of 1879] fondly hoped, the railroad has regulated the State. [¶] To Californians it is quite unnecessary to recall the motive that actuated the framers of the new Constitution when Article XII was adopted. It was thought that the Railroad Commission thereby created would be the bulwark between the people and the exactions and extortions and discriminations of the transportation companies. That the scheme then adopted has not proved effective has become only too plain. That this arose because of the individuals constituting the Railroad Commission is in the main true, but it is also apparent there has been a settled purpose on the part of the Southern Pacific Company not only to elect its own Railroad Commission, but also whenever those Commissioners made any attempt, however feeble, to act, to arrest the powers of the Commission, and to have those powers circumscribed within the narrowest limits. All of us who recall the adoption of the new Constitution will remember that we then supposed the most plenary powers were conferred upon the Commission. It has been gravely asserted of late, however, by those representing the Railroad Company, and they insist that in the decisions of our courts there is foundation for the assertion, that the Constitution does not give the Commission power to fix absolute rates. . . . [¶] . . . [¶] It is asserted that some ambiguity exists in the portion of the language of Section 22 of Article XII of the Constitution, which fixes the penalty when any railroad company shall fail or refuse to conform to rates established by the Commission or shall charge rates in excess thereof, and it is claimed that the use of the last phrase 'or shall charge rates in excess thereof' excludes the power to punish discrimination [in rates] by the railroad companies. The rational construction of the language used can lead to no such conclusion; *but if you believe there is any ambiguity in the constitutional provision as it now exists, or any doubt of the power conferred by it upon the Railroad Commission, I would suggest that this matter be remedied by a constitutional amendment.*" (Gov. Hiram Johnson, Inaugural Address (Jan. 3, 1911) Assem. J. (1911 Sess.) pp. 48–49, italics added.) The amendment of former section 22 of article XII, embodied in ACA No. 6, apparently was a direct response to Governor Johnson's suggestion.

In light of the ballot argument in favor of ACA No. 6, and the portion of Governor Johnson's inaugural address quoted above, it seems evident that the intent of the constitutional language in question was simply to make clear the existence of broad legislative power to grant the Railroad Commission *any* additional authority that was deemed necessary for the commission's proper regulation of the conduct of railroad companies, and to eliminate any potential legal argument that other provisions of the Constitution—such as the provision barring railroads from imposing rates in "excess of" the approved rates—should be interpreted to limit the type of authority that could be conferred upon the Railroad Commission. Nothing in this material suggests that this provision was intended to grant such authority to the Legislature alone, to the exclusion of any other entity that might then or thereafter possess legislative power to confer authority upon the Railroad Commission.[6]

Indeed, under the broader view provided by the historical background of the entire October 1911 election, it is even clearer that it would be unreasonable for us to interpret the constitutional language in question in the manner suggested by the Court of Appeal. The constitutional amendment containing the language at issue was only one part of a much broader reform program championed by the progressive movement. The October 1911 special election contained a quite extraordinary array of more than 20 proposed constitutional amendments, and perhaps the most prominent of all the measures placed before the voters at that special election were the proposed constitutional

---

[6] Although the parties identify only ACA No. 6 as the origin of the current language of article XII, section 5, a second measure on the October 10, 1911, special election ballot also contained language similar to that now found in article XII, section 5. Senate Constitutional Amendment No. 47 (SCA No. 47) proposed amending article XII, former section 23 to grant the Legislature the authority to significantly expand the power of the Railroad Commission by affording the commission the authority to supervise and regulate *all* "public utilities"—not only railroad and other transportation companies—and by defining "public utility" very broadly. After setting forth its broad definition of public utility, the measure went on to provide: "The railroad commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the legislature, *and the right of the legislature to confer powers upon the railroad commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this constitution.*" (Cal. Const., art. XII, former § 23, as amended by voters, Oct. 10, 1911, italics added.)

Unlike the argument relating to ACA No. 6, the argument in favor of SCA No. 47 did not specifically discuss the italicized language of the proposed amendment, but, as with ACA No. 6, nothing in the materials related to SCA No. 47 suggests that this language was intended to exclude the potential use of the initiative power in this area. SCA No. 47 was approved by the people at the October 1911 election, and the language in question remained a part of article XII, former section 23 until the comprehensive revision of article XII in 1974, when this language, along with the similar language in article XII, former section 22, was revised and moved to article XII, section 5. (See *County of Sonoma v. State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 366–368 [220 Cal.Rptr. 114, 708 P.2d 693].)

amendments creating and incorporating into the California Constitution the electorate's rights of initiative, referendum, and recall.[7]

Governor Hiram Johnson, in a separate part of his first inaugural address that preceded the passage quoted above relating to the Railroad Commission, emphasized the central importance of the initiative, the referendum, and the recall to the fundamental objectives of the progressive movement, declaring: "How best can we arm the people to protect themselves . . . ? If we can give to the people the means by which they may accomplish such other reforms as they desire, the means as well by which they may prevent the misuse of the power temporarily centralized in the Legislature, and an admonitory and precautionary measure which will ever be present before weak officials, and the existence of which will prevent the necessity for its use, then all that lies in our power will have been done in the direction of safeguarding the future and for the perpetuation of the theory upon which we ourselves shall conduct this government. This means for accomplishing other reforms has been designated the 'Initiative and the Referendum,' and the precautionary measure by which a recalcitrant official can be removed is designated the 'Recall.' And while I do not by any means believe the initiative, the referendum, and the recall are the panacea for our political ills, yet they do give to the electorate the power of action when desired, and they do place in the hands of the people the means by which they may protect themselves. I recommend to you, therefore, and I most strongly urge, that the first step in our design to preserve and perpetuate popular government shall be the adoption of the initiative, the referendum, and the recall. I recognize that this must be accomplished, so far as the State is concerned, by constitutional amendment. But I hope that at the earliest possible date the amendments may be submitted to the people, and that you take the steps necessary for that purpose." (Gov. Hiram Johnson, Inaugural Address (Jan. 3, 1911) Assem. J. (1911 Sess.) pp. 47–48.)

The Legislature responded by submitting (among many other measures) two proposed constitutional amendments to the voters at the October 10, 1911, special election, one relating to the initiative and referendum (Sen. Const. Amend. No. 22, amending Cal. Const., art. IV, § 1 (SCA No. 22)) and the other relating to the recall (Sen. Const. Amend. No. 23, adding Cal. Const., art. XXIII). The argument in favor of the adoption of the measure relating to the initiative and referendum stated in part: "Objection has been made that these powers would deprive the legislature of its functions. . . . [¶] It is not

---

[7] In addition to the provisions relating to the initiative, referendum, and recall and those revising and expanding the authority of the Railroad Commission, the October 10, 1911, ballot contained significant measures relating, among other subjects, to women's suffrage, civil service, workers' compensation, biennial legislative sessions, harmless error in criminal cases, and local home rule.

intended and will not be a substitute for legislation, but will constitute that safeguard which the people should retain for themselves, to supplement the work of the legislature by initiating those measures which the legislature either viciously or negligently fails or refuses to enact; and to hold the legislature in check, and veto or negative such measures as it may viciously or negligently enact. All objections finally and ultimately center in a distrust of democracy; in a challenge of the people to govern themselves. The voters are to decide by the adoption, or rejection, of this amendment to the constitution, as to whether self-government is a success or failure; as to whether the people believe in themselves. . . . [¶] Are the people capable of self-government? If they are, this amendment should be adopted. If they are not, this amendment should be defeated." (Sect. of State, Proposed Amends. to Const. with Legislative Reasons, Special Elec. (Oct. 10, 1911), Reasons Why SCA No. 22 Should Be Adopted.)

Both the measure relating to the initiative and referendum and the measure relating to the recall passed overwhelmingly, each by more than a three-to-one favorable vote. (See Sect. of State, Statement of the Vote of California, Special Elec. (Oct. 10, 1911), p. 5.)

When the October 10, 1911, election is viewed as a whole, it appears most improbable that—at the same election in which the voters overwhelmingly approved a far-reaching measure incorporating a broad initiative power as part of the California Constitution—they intended, without any direct or explicit statement to this effect, to *limit* the use of the initiative power by virtue of the language set forth in ACA No. 6. Indeed, the Court of Appeal's interpretation of the language of article XII, section 5 is all the more problematic when considered in light of the progressive movement's historic distrust of the Southern Pacific Railroad and of that entity's perceived ability to elect and control the members of the California Legislature. Because, as indicated by the quoted passage from Governor Johnson's inaugural address (see, *ante*, pp. 1038–1039), the proponents of these constitutional amendments strongly believed that the Southern Pacific's earlier control over the Legislature and the Railroad Commission had stymied effective regulation of the Southern Pacific in the past, it defies reason to suggest that those who drafted and those who voted to adopt the constitutional language in question intended to single out the jurisdiction and authority of the Railroad Commission as the one subject area in which the people's reserved right to initiate legislation could *not* be exercised, even if the need should arise. Viewing the constitutional language in context, we conclude it is much more reasonable to harmonize with each other the initiative and Railroad Commission constitutional amendments adopted at the October 1911 special election, and to interpret them as authorizing the people, through the initiative process, to

adopt statutory provisions granting additional authority or jurisdiction to the Railroad Commission.[8]

     █    Accordingly, in view of the long-standing California decisions establishing that references in the California Constitution to the authority of the Legislature to enact specified legislation generally are interpreted to include the people's reserved right to legislate through the initiative power, and in light of the background and purpose of the relevant language of article XII, section 5, we conclude that this constitutional provision does not preclude the

---

[8] Although we agree with the ultimate conclusion advanced by real parties in interest, we find one portion of their argument unpersuasive. In addition to including the language quoted above, from which the current language of article XII, section 5 is derived, ACA No. 6 specified: "The provisions of this section shall not be construed to repeal in whole or in part any existing law not inconsistent herewith, and the 'Railroad Commission Act' of this state approved February 10, 1911, shall be construed with reference to this constitutional provision *and any other constitutional provision becoming operative concurrently herewith.* And the said act shall have the same force and effect as if the same had been passed after the adoption of this provision of the constitution *and of all other provisions adopted concurrently herewith,* except that the three commissioners referred to in said act shall be held and construed to be the five commissioners provided for herein." (Italics added.) Real parties in interest suggest that this passage's reference to other constitutional provisions that might be adopted concurrently with ACA No. 6 likely was to the initiative constitutional amendment that also was on the October 10, 1911, ballot, and they maintain that "[t]he clear implication of this language is that, if the initiative provisions in SCA [No.] 22 should pass, they would apply to allow amendments by initiative to the Railroad Commission Act."

In our view, it is much more likely that this passage in ACA No. 6 was intended to refer to a number of other constitutional amendments on the October 10, 1911, ballot that dealt specifically with the powers of the Railroad Commission, rather than to the initiative amendment. As noted above (see, *ante,* p. 1040, fn. 6), SCA No. 47 on the October 1911 ballot contained a proposed amendment to article XII, former section 23 authorizing the Legislature to expand the Railroad Commission's jurisdiction to include a wide range of public utilities. In addition, Assembly Constitutional Amendment No. 50 (ACA No. 50) on the same ballot contained a proposed amendment to article XII, former sections 20 and 21 that, among other matters, required a railroad company to obtain permission from the Railroad Commission before raising rates and explicitly authorized the Railroad Commission to grant exemptions from a separate constitutional provision that generally prohibited a railroad from charging a lower rate for a long haul than for a short haul. We believe it is much more reasonable to interpret the language of ACA No. 6 as directing that the Railroad Commission Act "shall be construed with reference" to these other measures related to the Railroad Commission, rather than as requiring that the Railroad Commission Act be construed with reference to the initiative measure. (See Sect. of State, Proposed Amends. to Const. with Legislative Reasons, Special Elec. (Oct. 10, 1911), Reasons Why ACA No. 50 Should Be Adopted ["The amendment is one of the series composed of Senate Constitutional Amendment No. 47 and Assembly Constitutional Amendments Nos. 6 and 50, and as an amendment in the direction of efficient railroad rate regulation should unquestionably be ratified by the people"].)

Accordingly, contrary to the argument of real parties in interest, we conclude that the reference in ACA No. 6 to other constitutional provisions considered at the same election provides no additional support for their position. Nonetheless, for the other, more persuasive reasons discussed above, we conclude that the Court of Appeal erred in its interpretation of article XII, section 5.

people, through their exercise of the initiative process, from conferring additional powers or authority upon the PUC.[9]

## IV

For the reasons discussed above, we conclude that the judgment of the Court of Appeal must be reversed. Because Proposition 80 was defeated at the November 8, 2005, election, the challenge to that proposition in this proceeding is moot. Accordingly, the judgment of the Court of Appeal is reversed and the matter is remanded to that court with directions to dismiss the proceeding as moot.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[9] To avoid any potential misunderstanding, we emphasize that our holding is limited to a determination that the provisions of article XII, section 5 do not preclude the use of the initiative process to enact statutes conferring additional authority upon the PUC. We have no occasion in this case to consider whether an initiative measure relating to the PUC may be challenged on the ground that it improperly *limits* the PUC's authority or improperly conflicts with the Legislature's exercise of *its* authority to expand the PUC's jurisdiction or authority. Should these or other issues arise in the future, they may be resolved through application of the relevant constitutional provision or provisions to the terms of the specific legislation at issue.